IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

IN RE SEARCH OF:                             )
                                             )
INFORMATION RE: INSTAGRAM                    )
USERS elisa.1219, elisa12.19,                )
marial._9, elisal, J.mc.23, j2c.3,           )
j_c2123, alyssa._09, m.elisa1219             )      Case No.  1:19mj3157
THAT IS STORED AT PREMISES                   )
CONTROLLED BY FACEBOOK, INC                  )

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Casey T. Carty, a Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I make this affidavit in support of an application for a search warrant for information associated with the Instagram usernames: "elisa.1219", "elisa12.19", "marial._9", "elisal", "J.mc.23", "j2c.3", "j_c2123", "alyssa._09", "m.elisa1219" (the "SUBJECT ACCOUNTS") that is stored at premises owned, maintained, controlled, or operated by the social-networking company Facebook, Inc. ("Facebook"), headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to require Facebook to disclose to the government Instagram records and other information in its possession, including the contents of communications, pertaining to the subscriber or customer associated with the SUBJECT ACCOUNTS.

2.       I am a Special Agent with the FBI, presently assigned to the Cleveland Office, and have been employed by the FBI since April 2004. I have investigated numerous cases involving violent crime, white collar crime, crimes against children, and drug offenses. I have extensive experience in executing search warrants for residences, vehicles, and for electronic devices, and in the planning and execution of arrest warrants. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including reports of other law enforcement officers involved in the investigation. As an FBI Special Agent, I am authorized to seek and execute federal arrest and search warrants for Title 18 criminal offenses, including offenses related to the sexual exploitation of minors, specifically those involving the possession, receipt or distribution of child pornography, in violation of Title 18 United States Code Section 2252; transportation of a minor with intent to engage in criminal sexual activity, in violation of Title 18 United States Code Section 2423; and transfer of obscene material to minors, in violation of Title 18 United States Code Section 1470. I am responsible for investigations involving the production, importation, advertising, receipt, and distribution of child pornography which occur in the Northern District of Ohio.

3.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §2252 and 18 U.S.C. §2423 and 18 U.S.C. §1470 have been committed by JEREMY CRUZ. There is also probable cause to search

the SUBJECT ACCOUNTS for information described in Attachment A for evidence of these crimes and items to be seized listed in Attachment B.

## Probable Cause

5.      From my review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Facebook and Instagram.

6.      Facebook owns and operates Instagram, a free-access social-networking website that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other information. Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

7.      Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter.  When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user made add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information.  A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos.  In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram.  Users can also "like" photos.

8.      Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password. This information is collected and maintained by Instagram.

9.      Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile. This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram. Once an account is created, users may also adjust various privacy and account settings for the account on Instagram. Instagram collects and maintains this information.

10.      Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public. Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

11.      Instagram allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

12.      Instagram allows users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

13.      Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

14.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

15.     Instagram also collects and retains "log file" information which is information captured every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web request, any Internet Protocol ("IP) address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

16.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

17.     Instagram also collects information on the particular devices used to access Instagram. In particular, Instagram may record "device identifiers," which include data files and other information that may identify the particular electronic device that was used to access Instagram.

18.     Instagram also collects other data associated with user content. For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

19.     Instagram may communicate with the user via email or otherwise. Instagram collects and maintains copies of communications between Instagram and the user.

20.     As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time.  Further, Instagram account activity can show how and when the account was accessed or used.  For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation.  Additionally, Instagram builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner.  Last, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation.  For example, information on the Instagram account may indicate the owner's

motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

21.     Based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the SUBJECT ACCOUNTS as detailed in Attachment A, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

### Information To Be Searched And Things To Be Seized

22.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### Background of the Investigation

23.     On April 18, 2019, I learned that FBI Agents and local law enforcement officers in Santa Maria, California and in Northeast Ohio were investigating the disappearance of a 14 year old female who, for the purposes of this affidavit, will be identified as "M.C."  The investigation was initiated on April 15, 2019 when M.C.'s parents contacted the Santa Maria Police Department (SMPD) to report her missing.  SMPD officers investigating the initial complaint located two notes written and left behind by

M.C. in which she told her parents she was running away with her boyfriend and his cousin. SMPD officers determined that M.C. had completed a factory reset of her cellular phone, effectively deleting the phone's contents, and left the phone behind at her parents' home.

24.     On April 15, 2019, SMPD officers were informed by family, in particular a cousin, that M.C.'s Instagram account showed an "active" status. Relatives of M.C. advised investigators that M.C. had several Instagram accounts to include the user names "elisa.1219", elisa12.19", "maria1._9", and "elisa1". SMPD then served preservation requests to four of the Instagram URL's as described in Attachment A.

25.     On April 17, 2019 M.C.'s parents provided SMPD with phone records for M.C.'s cellular phone. The records indicated M.C. had been in frequent contact with telephone number 440-420-8332. M.C.'s younger sister recognized this number as one she had seen written on a piece of paper in M.C.'s bedroom with the name "Jeremy" next to it. M.C.'s sister identified "Jeremy" as a male from another state whom M.C. had "met" online. SMPD's research identified the number as belonging to a Jeremy Cruz of Elyria, Ohio.

26.     SMPD contacted Cruz at 440-420-8332 and learned the following; Cruz knew M.C. but had not contacted her for several weeks. He met her online, knew she was a teenager, and the two became friends. Cruz claimed to have never met M.C. in person.

27.     SMPD contacted the Elyria Police Department (EPD) and requested EPD conduct a check of Cruz's residence, located at 2510 W River Rd N, Elyria, Ohio. EPD made contact with Cruz's mother, Johnanna Cruz, at this address and learned the following; Cruz had been living with his mother as a result of his pending divorce. Cruz drives a 2012 Chevrolet Malibu with Ohio registration DT50AJ. Cruz left Elyria on either April 11 or April 12 on a trip, however Johnanna did not know where he might have traveled. Neither Cruz nor M.C. were located in the residence.

28.     SMPD obtained records associated with Cruz's phone number from Verizon and learned the following from an analysis of the records; Cruz's phone traveled from Ohio to Santa Maria, California

and back to Ohio. The phone was in Santa Maria on April 15, 2019, the day M.C. was reported missing by her parents, and then traveled back to Ohio.

29.     On April 17, 2019, FBI personnel began to provide assistance to SMPD with their agency's efforts to locate and recover M.C. Analysis of historical and real-time cellular phone data, including data showing the specific sectors of the specific cellular phone towers where Cruz's phone was located, as well as records showing calls made to and from Cruz's phone determined the following; on April 17, 2019 Cruz's cellular phone was in the general vicinity of his mother's home in Elyria at approximately 12:15 p.m. At approximately 7:44 p.m. a call was placed from Cruz's phone to telephone number 440-308-5886. Open source information indicated that 440-308-5886 is associated with Michael Otero and Jessica Gallion of 5115 Lake Road East, Apt 720, Sheffield Lake, Ohio. At approximately 8:15 p.m. Cruz's phone moved away from the vicinity of his mother's home in the general direction of Sheffield Lake. Between approximately 8:31 p.m. on April 17 and 1:19 a.m. on April 18, Cruz's phone was located in Sheffield Lake, in the cell tower sector covering the apartment building at 5115 Lake Road East.

30.     At approximately 3:30 a.m. on April 18, I located Cruz's 2012 Chevrolet Malibu bearing Ohio registration DT50AJ in the parking lot of 5115 Lake Road East, Sheffield Lake, Ohio. At approximately 5:00 a.m., an arrest team consisting of officers of the Sheffield Lake and Avon Lake Police Departments and I knocked and announced our presence at the door of 5115 Lake Road East, Apt 720. After an inordinate amount of time passed, the apartment door was opened.

31.     The arrest team made entry into the apartment and located Jeremy Cruz lying on a mattress on the living room floor. Cruz was arrested on a warrant issued by the State of California for Child Concealment. Cruz denied knowledge of the location of a young female, however the female occupant of the apartment, Jessica Gallion, confirmed that a young female was hiding in the apartment's back bedroom. Another male, Jonathan Otero, was also identified inside the apartment. I approached the female in the back bedroom and confirmed her identity as M.C.

32.     Cruz and M.C. were transported (separately) to the Sheffield Lake Police Department (SLPD). Prior to departing the apartment, Cruz identified his cellular phone and I recovered the phone from the coffee table within the apartment. As I was taking custody of Cruz's phone, Otero confirmed that the phone belonged to Cruz. I also learned from Otero that Cruz was his cousin.

33.     At SLPD, I advised Cruz of his rights pursuant to *Miranda* and he agreed to speak with me. Cruz provided the following information; Cruz met M.C. online approximately two to three years prior and has been communicating online with her ever since. On or about April 13, 2019, Cruz drove from Elyria to Las Vegas. On or about April 15 he picked up M.C. from near her home in Santa Maria, turned around and drove back to Elyria. Cruz and M.C. did not make any overnight stops while enroute from Santa Maria to Elyria, but would occasionally pull over for sleep and short rest breaks in the car. Cruz and M.C. arrived in Elyria on April 17. Cruz denied that any sexual contact between him and M.C. occurred and denied that any child pornography would be found on his phone. Cruz acknowledged that M.C. was 14 years of age and that he was 39 years old.

34.     Cruz provided written consent for the FBI or its designee to conduct a search of his cellular phone, a Samsung Galaxy assigned telephone number 440-420-8332.

35.     I spoke briefly with M.C. while at SLPD and learned the following information; Cruz picked up M.C. from Santa Maria on or about April 15, and the pair drove back to Cruz's hometown in Ohio. They drove straight through from California to Ohio and did not make any overnight stops at hotels along the way. They did pull over and take occasional short breaks for sleep and rest in the car. At the time of her recovery by law enforcement in Sheffield Lake, M.C. did not know what city she was in. Cruz and M.C. drove from California to Ohio in Cruz's small tan car. M.C. met Cruz online and had been communicating with him on an almost daily basis for some time.

36.     Agents with the FBI met with Jessica Gallion later on April 18 and learned the following information; Cruz appeared at her apartment on April 17 accompanied by M.C. Cruz introduced M.C. as "his girl" and sat very close to her on the couch in the apartment. Cruz and M.C slept on the mattress on apartment's living room floor.

10

37.     On April 18 FBI Cleveland personnel completed a digital forensic extraction of the contents of Cruz's cellular phone. I conducted a preliminary review of this phone and noted that the phone contained over 5000 files containing videos and still images. I observed over 40 still images and 1 video depicting prepubescent children as young as approximately 4 years old engaged in overt sexual acts with adults and/or lascivious displays of the genitalia of such children.

38.     With regards to the images of child pornography described above in Paragraph 37, I observed at least (4) images of children under 7 years of age performing oral sex on adult males. I observed (1) image of a female child of approximately 6 years of age being vaginally penetrated by an adult male's penis. I observed (1) image of a female child under 5 years of age being vaginally penetrated by what appears to be a drumstick. The review of the contents of Cruz's phone is ongoing.

39.     The phone on which the images of child pornography described in Paragraphs 37 and 38 were located is the phone which SMPD's analysis (described in Paragraph 28) indicated had traveled in interstate commerce between on or about April 15 and on or about April 17, 2019.

40.     On April 22, 2019, your Affiant interviewed Gena Szakats, wife of Jeremy Cruz. Szakats indicated she knew Cruz had been communicating with a female from California for approximately two years via social media, in particular Instagram. Cruz's children had identified several Instagram accounts used by Cruz AND M.C., and had even confronted Cruz about the Instagram accounts, described in Attachment A. According to Szakats, Cruz and M.C. both used the account "j2c.3", while Cruz used "J.mc.23". Szakats identified additional accounts used by M.C. as "j_c2123", "alyssa._09", and "m.elisa1219". Therefore, it is believed that Cruz and M.C. each had access to shared Instagram accounts, potentially all nine accounts noted in this affidavit.

41.     On April 22, 2019, M.C. was interviewed at a child advocacy center located in Santa Maria, California. During this interview, M.C. indicated that M.C. and Cruz would communicate with and share photographs of each other via social media accounts, to include Instagram for approximately the last two years, dating back to the summer between M.C.'s sixth

and seventh grade school years.  M.C. also indicated that she and Cruz have sent naked pictures of themselves to each other.

## Conclusion

42.      Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 18 U.S.C. § 2252, 18 U.S.C. § 2423, and 18 U.S.C. § 1470 may be located in the SUBJECT ACCOUNTS described in Attachment A.

43.      This Court has jurisdiction to issue the requested warrant to Facebook, Inc., because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

44.      Based on the forgoing, I request that the Court issue the proposed search warrant.

45.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on Instagram, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Casey T. Carty
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after
submission by reliable electronic
means. Crim.Rules. 4.1; 41(d)(3)



Thomas M. Parker
United States Magistrate Judge
**8:33 AM, May 23, 2019**